1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOHN LLOYD HOUSTON,                    No.  2:  15-cv-2055 WBS KJN P

12              Plaintiff,

13        v.                                ORDER AND FINDINGS AND
                                            RECOMMENDATIONS
14   RIO CONSUMNES CORRECTIONAL
     FACILITY, et al.,
15
                Defendants.
16

17   I.  Introduction

18        Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant

19   to 42 U.S.C. § 1983.  Pending before the court are plaintiff's motion to re-open discovery (ECF

20   No. 58), plaintiff's motion to amend (ECF No. 59), and defendant Sacramento County's motion

21   for summary judgment (ECF No. 52.)  Defendant moves for summary judgment on the grounds

22   that plaintiff failed to exhaust administrative remedies and on the merits of plaintiff's claims.

23        For the reasons stated herein, plaintiff's motion to re-open discovery is denied.  The

24   undersigned recommends that plaintiff's motion to amend be granted in part and denied in part,

25   and that defendant's motion for summary judgment be granted.

26   ////

27   ////

28   ////

                                         1

II.  Motion to Amend and Motion to Re-Open Discovery

      A.  Motion to Re-Open Discovery

      This action proceeds on the amended complaint filed October 26, 2015, as to defendant Sacramento County.  (ECF No 7.)  Plaintiff alleges that while he was housed at the Sacramento County Jail, he did not receive prescription drug treatment for hepatitis C pursuant to an official county policy not to test, treat or cure hepatitis C.  In the pending summary judgment motion, defendant states that at his deposition, plaintiff clarified that he is claiming that defendant had an official policy to treat hepatitis C, but did not follow it.  (ECF No. 52-2 at 2.)  In his opposition to defendant's summary judgment motion, plaintiff agrees that he is suing defendant on this theory. (ECF No. 65 at 12.)  The parties agree that defendant's official policy for treating inmates with hepatitis C is called "Policy 1741."

      In the pending motion to re-open discovery, plaintiff argues that defendant misled plaintiff concerning the official policy for hepatitis C treatment for over one year.  (ECF No. 58 at 1.) Plaintiff argues that he was always told "by defendant that it was their policy not to treat hepatitis C…plaintiff only found out through internal affairs the truth that they have a policy to treat [hepatitis C] in early October 2016."  (Id.)  Plaintiff seeks additional time to conduct discovery regarding this policy.

      Modification of a scheduling order requires a showing of good cause, Fed. R. Civ. P. 16(b), and good case requires a showing of due diligence.  Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992).  To establish good cause, the party seeking the modification of a scheduling order must generally show that even with the exercise of due diligence, they cannot meet the requirement of the order.  Id.

      Pursuant to the June 1, 2016 discovery and scheduling order, the discovery deadline was October 7, 2016.  (ECF No. 31.)  Plaintiff filed the pending motion to re-open discovery on December 28, 2016.  Plaintiff seeks to reopen discovery based on information he learned in early October 2016.  Plaintiff does not explain why he waited almost three months, after learning about defendant's policy to treat hepatitis C, to request additional time to conduct discovery.  For this reason, the undersigned finds that plaintiff has not shown due diligence.

Moreover, to succeed on either theory, i.e. that defendant had an official policy to treat hepatitis C but failed to follow it, or defendant had an official policy not treat to treat hepatitis C, plaintiff must demonstrate that he qualified for the prescription drug treatment. As discussed herein, plaintiff has not met this burden. For this additional reason, plaintiff has not demonstrated good cause to re-open discovery.

For the reasons discussed above, plaintiff's motion to re-open discovery is denied.

B. <u>Motion to Amend</u>

On December 28, 2016, plaintiff filed a motion for leave to file a second amended complaint and proposed second amended complaint. (ECF Nos. 55, 59.) On January 11, 2017, defendant filed an opposition to the motion to amend. (ECF No. 64.)

Motions to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure. Rule 15(a) provides that the Court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). In the Ninth Circuit, Rule 15(a) is applied with "extreme liberality." <u>Eminence Capital, LLC v. Aspeon, Inc.</u>, 316 F.3d 1048, 1051 (9th Cir. 2003).

Nevertheless, the court retains discretion to grant or deny a motion for leave to amend. <u>Leadsinger, Inc. v. BMG Music Pub.</u>, 512 F.3d 522, 532 (9th Cir. 2008). The court considers five factors when assessing the propriety of a motion for leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether the plaintiff has previously amended his complaint. <u>Allen v. City of Beverly Hills</u>, 911 F.2d 367, 373 (9th Cir. 1990). The court "need not apply all five factors" when two factors sufficiently persuade the court to deny the motion. <u>Id.</u>

The proposed second amended complaint names as defendants Sacramento County and County Health Services ("CHS"). (ECF No. 55 at 1.) Plaintiff alleges that a nurse and Dr. Padilla told him that it was CHS policy not to treat hepatitis C. Plaintiff alleges that Dr. Padilla told him that it was cheaper to let him die. (<u>Id.</u> at 2.) Plaintiff alleges that his hepatitis C required medical treatment. (<u>Id.</u> at 3-4.) Plaintiff alleges that defendants, "against administrative policy have accepted and adopted a common practice" to deny plaintiff prescription drug treatment for hepatitis C. (<u>Id.</u> at 4.)

3

At the outset, the undersigned agrees with defendant that CHS is not a proper defendant. According to defendant, CHS is a non-independent subsidiary of Sacramento County.  Under § 1983, a "person" may be sued for the deprivation of federal rights, and municipalities or other governmental bodies may be sued as a "person."  <u>Monell v. Dept. of Soc. Servs.</u>, 436 U.S. 658, 690 (1978).  An agency or department of a municipal entity is not a proper defendant under Section 1983.  <u>Vance v. County of Santa Clara</u>, 928 F.Supp. 993, 996 (N.D. Cal. 1996).  Rather, the county itself is the proper defendant.  Accordingly, CHS is not a proper defendant.

With respect to defendant Sacramento County, plaintiff's proposed amendment appears consistent with the legal theory addressed in defendant's summary judgment motion, as clarified by plaintiff's deposition testimony, i.e., defendant had a policy to provide prescription drug treatment for inmates with hepatitis C, but failed to follow it.  In the opposition to the pending motion, defendant states that "plaintiff's claims concerning the treatment he was provided for his hepatitis C have been fully addressed in the summary judgment motion and plaintiff's motion to amend should be denied as futile because no new claims are raised."  (ECF No. 64 at 6.)

The undersigned agrees that a motion for leave to amend is futile if it can be defeated on a motion for summary judgment.  <u>Gabrielson v. Montgomery Ward & Co.</u>, 785 F.2d 762, 766 (9th Cir. 1986).  However, plaintiff is attempting to amend his complaint to include the legal theory addressed in defendant's summary judgment motion.  Allowing plaintiff to amend his complaint to conform to the theory addressed in the summary judgment motion is not futile.

Defendant also argues that it would be prejudiced were the court to grant the motion to amend because it would require defendant to conduct additional discovery, although defendant does not specifically identify this discovery.  Because defendant's summary judgment motion is based on the theory raised in the proposed second amended complaint, it is difficult to determine what additional discovery would be required.

Balancing all of the factors set forth above, the undersigned finds that plaintiff should be allowed to file a proposed second amended complaint as to his claims against defendant Sacramento County that are consistent with the claims addressed in the pending summary judgment motion.  Plaintiff's motion to amend to name CHS as a defendant should be denied as

well as any claims inconsistent with those addressed in the summary judgment motion.

Accordingly, for the reasons discussed above, the undersigned recommends that plaintiff's motion to amend be granted in part and denied in part.

III.  Motion for Summary Judgment

A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).

"Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

////

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F.

Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on August 16, 2013(ECF No. 22), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (*en banc*); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

B. Discussion re: Merits

1. Legal Standard

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994). "Although the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's protection against cruel and unusual punishment, applies to pretrial detainees...we apply the same standards in both cases." Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010) (citation omitted).

> In the Ninth Circuit, the test for deliberate indifference consists of two parts. First, the plaintiff must show a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.

Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citations omitted).

The legal standard for liability for defendant Sacramento County follows herein. "In Monell v. Department of Social Services, 436 U.S. 658 (1978), the Supreme Court held that a municipality may not be held liable for a § 1983 violation under a theory of respondeat superior for the actions of its subordinates." Castro v. County of Los Angeles, 833 F.3d 1060, 1073 (9th Cir. 2016). In this regard, "[a] government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a

violation of constitutional rights." <u>Dougherty v. City of Covina</u>, 654 F.3d 892, 900 (9th Cir. 2011) (citing <u>Monell</u>, 436 U.S. at 694).

### 2. Dispute Regarding Policy 1741

As discussed above, defendant's policy for treating inmates with hepatitis C is Policy 1741. Plaintiff submitted a request for a copy of this policy directly to the Sacramento Sheriff's Department, which plaintiff refers to as "internal affairs." (See ECF No. 47.) In response to this request, the Sacramento County Sheriff's Department, i.e., "internal affairs," provided plaintiff with an older version of Policy 1741. (See ECF Nos. 60, 62.) The policy plaintiff received from "internal affairs" was in effect from approximately 2007 until September 2015. (ECF No. 62-1 at 2.)

Plaintiff was housed at the Sacramento County Jail from June 2015 to June 2016. As discussed herein, the newer version of Policy 1741 was in effect at the time plaintiff sought treatment for hepatitis C. In the opposition to the pending motion, plaintiff argues that he qualified for prescription drug treatment under the older version of Policy 1741.

Under either version of Policy 1741, plaintiff must show that his failure to receive prescription drug treatment violated the Fourteenth Amendment. As discussed herein, plaintiff has not met this burden. In determining the standard of care for prescription drug treatment, the undersigned herein discusses the differences between the older and newer versions of Policy 1741. The other differences between the two policies are not relevant to plaintiff's claim. However, in footnotes, the undersigned addresses some of the differences raised by plaintiff in his opposition to the pending motion.

### 3. Undisputed Facts

*Undisputed Facts Regarding Policy 1741*

County of Sacramento Correctional Health Services ("CHS") has in place an express policy that provides for medically appropriate evaluation and treatment of inmate-patients with hepatitis C.[1] (ECF No. 52-2 at 2.) County of Sacramento CHS treatment protocol for hepatitis C

---

[1] As discussed above, plaintiff does not dispute that this policy exists. (ECF No. 65 at 13.) Instead, plaintiff disputes that he was provided treatment pursuant to this policy. (<u>Id.</u>)

is titled Administrative Policy Number 1741 ("Policy 1741"). (Id.) Policy 1741 defines treatment protocols for patients with hepatitis C in County of Sacramento detention facilities. (Id.)

Policy 1741 provides that inmate-patients requesting treatment for their hepatitis C will be evaluated and an appropriate plan of care developed for them on a case by case basis. (ECF No. 52-2 at 2; ECF No. 65 at 13-14.) If an inmate-patient was already receiving hepatitis C treatment prior to incarceration from a private provider or other government facility, their treatment will be confirmed and then resumed by County of Sacramento CHS. (ECF No. 52-2 at 2; ECF No. 65 at 14.)

Pursuant to Policy 1741, inmate-patients that have been diagnosed with hepatitis C will be assessed using the defined screening tools after six months of incarceration. (ECF No. 52-2 at 2; ECF No. 65 at 14.) The purpose of the six month in-custody waiting period is that CHS medical professionals need to acquire an accurate baseline of an inmate's liver function in the absence of recent use of drugs or alcohol in order to properly assess the progress of the patient's hepatitis C disease. (ECF No. 52-2 at 2-3; ECF No. 65 at 14.)

Policy 1741 provides that an inmate-patient must meet the following criteria prior to initiating diagnostic testing to evaluate whether they are a candidate for treatment: 1) Be alcohol and drug free for a minimum of 6 months, and be willing to participate in regular drug testing; 2) Have at least 12 months of incarceration time remaining at the time of initial screening to allow for secondary screening, review by a specialist, treatment plan development, and completion of treatment;[2] 3) Must be compliant with testing and treatment. A past history of medications or lab

---

[2] Plaintiff disputes that Policy 1741 states that an inmate-patient must have at least 12 months of incarceration remaining at the time of initial screening to allow for completion of treatment. (ECF No. 65 at 15.) Plaintiff claims that the policy provides for partial treatment under certain circumstances, i.e, the ability to complete treatment while housed at the jail is not required for treatment. (Id.) The older version of Policy 1741 plaintiff received in response to his "Internal Affairs" request does state that patients may receive partial treatment under certain circumstances. (ECF No. 47 at 13.) The later policy, in effect at the time of plaintiff's incarceration at the Sacramento County Jail, does not provide for partial treatment. (ECF No. 52-5.) Instead, the new policy states that to receive hepatitis treatment, patient-inmates must have at least 12 months of incarceration remaining to allow for completion of treatment. (Id. at 14.)

refusals may bar the patient inmate from participating in treatment. Refusing medications or labs during treatment will result in review and possible termination of treatment; 4) Must be willing to submit to a liver biopsy. The best predictor of the rate of disease progression is a liver biopsy; 5) Must not have a history of previously completed or failed hepatitis C treatments; and 6) Females must not be pregnant and be willing and able to practice birth control. (ECF No. 52-5 at 3; ECF No. 65 at 15.)

After it is determined that the patient-inmate meets the requirements, various assessments will be completed to evaluate the baseline status of the inmate-patient's hepatitis C. (ECF No. 52-2 at 3; ECF No. 65 at 16.) The assessments used to determine whether an individual is a candidate for hepatitis C treatment includes: review of their medical history; a full physical exam; complete set of vitals; lab tests including blood serum chemistry, virology panel, and urinalysis. (ECF No. 52-3 at 3; ECF No. 65 at 16.) The assessments are completed every six months to follow the progression of the disease and to determine if treatment is needed.[3] (ECF No. 52-3 at 3.)

Under Policy 1741, once the assessments are completed, the results are reviewed by County of Sacramento CHS medical staff and a medical determination is made for that particular inmate's case to determine whether the inmate-patient is a candidate for treatment based on the progression of their disease.[4] (ECF No. 52-2 at 3-4.) Based on the opinion of the reviewing

---

[3]  Plaintiff disputes that the assessments occur every six months. (ECF No. 65 at 16.) Plaintiff argues that the policy provides that patients who are not eligible for treatment will be followed regularly every three to six months and informed of their current status. (Id.) The older policy, provided to plaintiff in response to his "internal affairs" request, provided that patients who are not eligible for interferon treatment would be followed regularly every three to six months and informed of their current status. (ECF No. 47 at 13.) The newer policy, in effect at the time of plaintiff's incarceration in the Sacramento County jail, provides that inmates will be assessed every six months to follow the progression of the disease and to determine if treatment is needed. (ECF No. 52-5 at 15.)

[4]  Plaintiff disputes that medical staff evaluate the results of the assessments in order to determine whether treatment is warranted. (ECF No. 65 at 17.) Plaintiff argues that Policy 1741 provides that medical staff are to evaluate the patient's health factors and lab results in accordance with the criteria established by the National Institute of Health ("NIH"). (Id.) Plaintiff argues that the policy does not state that eligibility for treatment is based on the opinion of reviewing medical staff. (Id.) As discussed in more detail herein, the older policy, provided to plaintiff in response

medical staff it is then determined whether the inmate-patient should only be monitored, whether the inmate-patient's assessment is to proceed to the next evaluative step in staging the disease and undergo a liver biopsy to determine the appropriate treatment, or whether treatment should be initiated immediately.  (Id. at 3.)

*Undisputed Facts Regarding Plaintiff's Care at the Sacramento County Jail*

Records from plaintiff's previous incarcerations indicate that he was diagnosed with hepatitis C in December of 2011.  (ECF No. 52-2 at 4; ECF No. 65 at 18.)

Plaintiff entered the custody of defendant Sacramento County on June 25, 2015, as a pretrial detainee.  (ECF No. 52-2 at 2; ECF No. 65 at 12.)  Plaintiff was transferred to North Kern State Prison ("NKSP") on June 26, 2016.  (ECF No. 52-2 at 2; ECF No. 65 at 12.)  Plaintiff had not been receiving treatment for hepatitis C prior to entering the custody of defendant Sacramento County.  (ECF No. 52-2 at 2; ECF No. 65 at 12.)  Plaintiff engaged in intravenous drug use of methamphetamine prior to entering the custody of defendant Sacramento County.  (ECF No. 52-2 at 2; ECF No. 65 at 13.)

On September 29, 2016, plaintiff's blood and urine were collected and tested for hepatitis C.  (ECF No. 52-5 at 4; ECF No. 65 at 57 (plaintiff's medical records).)  On January 5, 2016, in accordance with Policy 1741, plaintiff had his blood drawn by lab technicians for the assessments to be performed.  (ECF No. 52-2 at 6; ECF No. 65 at 22.)

Plaintiff's lab results were received on January 12, 2016, and demonstrated, in part, the following relevant values with respect to Hepatitis C:  GGT 32 (normal), AST 38 (normal), ALT 55 (slightly elevated), platelet count 251, HCV RNA quantitative 13848631 (indicates presence of hepatitis C).  (ECF No. 52-2 at 6; ECF No. 65 at 22-23.)  On or around January 21, 2016, Dr. Nugent, the CHS Medical Director, decided that plaintiff did not qualify for prescription drug

---

to his "internal affairs" request, provided that inmate patients would be treated with interferon and ribavirin according to the eligibility criteria established by the NIH and under the consultative care of a gastroenterologist.  (ECF No. 47 at 13.)  The newer policy, in effect at the time of plaintiff's incarceration at the Sacramento County jail, does not mention the NIH guidelines. (ECF No. 52-5 at 14-16.)  The newer policy sets forth the criteria for evaluating an inmate patient's eligibility for treatment.  (Id.)  According to the CHS Medical Director, Dr. Nugent, this evaluation is made by CHS medical staff.  (ECF No. 52-5.)

treatment for his hepatitis C.[5]  (ECF No. 52-2 at 6.)  As discussed herein, plaintiff disputes whether Dr. Nugent correctly found that he did not qualify for prescription drug treatment.

In accordance with Policy 1741, plaintiff had follow-up lab assessments approximately six months later on June 6, 2016.  (ECF No. 52-2 at 6; ECF No. 65 at 26.)  Dr. Nugent decided that plaintiff did not qualify for prescription drug treatment.  (ECF No. 52-5 at 6; ECF No. 65 at 26.)  As discussed herein, plaintiff disputes whether Dr. Nugent correctly found that he did not qualify for prescription drug treatment.

On June 24, 2016, plaintiff transferred to the custody of the California Department of Corrections and Rehabilitation.  (ECF No. 52-2 at 7; ECF No. 65 at 26-27.)

4.  Analysis—Deliberate Indifference

Defendant Sacramento County moves for summary judgment on the grounds that plaintiff's failure to receive prescription drug treatment did not constitute deliberate indifference.

*Standard for Determining Eligibility for Prescription Drug Treatment*

At the outset, the undersigned clarifies the standard for determining eligibility for prescription drug treatment.

Policy 1741 states, in relevant part,

> Hepatitis C (HCV) is a chronic disease.  It usually takes several decades to progress to a life threatening state.  Many persons who are infected have no symptoms and do not progress to end stage liver disease or liver cancer.  The patient continues to test positive for HCV while having stable liver function.
>
> Not every patient with HCV needs to be treated.  Only 10-20% of patients with HCV progress to severe disease and only 1% to 5% will die from complications of liver disease.  The need to treat is based on a number of factors including, the patient's use of alcohol and drugs, their willingness to be compliant with treatment, their current health, and the progression of the disease.

---

[5]  Plaintiff argues that when Dr. Nugent reviewed his record, FNP Jim Holt had already reviewed the records on January 12, 2016, and decided that plaintiff did not require treatment.  The medical records indicate that FNP Holt reviewed the results of plaintiff's blood tests on January 12, 2016, and wrote:  "PLAN: no action taken."  (ECF No. 52-5 at 30.)  The records reflect that plaintiff sought administrative review of FNP Holt's decision to take no action.  (Id. at 29.)  It appears that Dr. Nugent's review of plaintiff's lab results was part of the administrative review of FNP Holt's decision to take no action.  (Id.)

12

(ECF No. 52-5 at 13.)

Policy 1741 lists three factors to consider when evaluating an inmate-patient's eligibility for prescription drug treatment:  drug and alcohol use, current health, and the progression of the disease.  In January 2016 and June 2016, Dr. Nugent found that plaintiff did not qualify for prescription drug treatment based on consideration of these three factors.  (ECF No. 52-2 at 6.) As discussed herein, Dr. Austria considered the same factors in evaluating plaintiff's eligibility for prescription drug treatment following his transfer to CDCR custody in June 2016.  (ECF No. 52-6 at 7-8.)

The undersigned observes that while defendant does not directly address whether the three factors for evaluating eligibility for prescription drug treatment contained in Policy 1741 meet constitutional standards, in his declaration Dr. Nugent states that, in his opinion, plaintiff's treatment for hepatitis C was within the acceptable medical standards of care and skill in the community.  (ECF No. 52-5 at 9-10.)

In his opposition, plaintiff argues that the older version of Policy 1741 sets a different standard for determining eligibility for prescription drug treatment.  Plaintiff argues that the older version of Policy 1741 provides that inmate-patients receive prescription drug treatment according to eligibility criteria established by the National Institute for Health ("NIH") and under the consultative care of a gastroenterologist.  (See ECF No. 65 at 47.)  Plaintiff appears to argue that he was entitled to prescription drug treatment based on the NIH standards.  However, plaintiff does not describe the NIH standards or offer any evidence demonstrating that these standards are different from those considered by Dr. Nugent and Dr. Austria.  Plaintiff offers no expert evidence that the factors considered by Dr. Nugent were not within the standard of care.

Based on the declarations of experts Dr. Nugent and Dr. Austria, the undersigned finds that Dr. Nugent's consideration of plaintiff's prior drug use, current health and progression of the disease in determining his eligibility for prescription drug treatment was within the standard of care.  Accordingly, application of these three factors to determine plaintiff's eligibility was proper and did not violate plaintiff's Fourteenth Amendment rights.  See Acinelli v. Torres, 2015 WL 4380772 at *4 (C.D. Cal. 2015) ("The Eighth Amendment does not require optimal medical care

or even medical care that comports with the community standard of care.").  The issue is whether Dr. Nugent correctly considered these factors in finding that plaintiff did not qualify for prescription drug treatment.

*Declarations of Dr. Nugent and Dr. Austria Regarding Plaintiff's Eligibility for Prescription Drug Treatment*

In his declaration, Dr. Nugent discusses his decisions finding plaintiff ineligible for prescription drug treatment in January 2016 and June 2016:

> 7.  Hepatitis C is a chronic disease where in a majority of cases it takes several decades before it poses tangible harm to the patient's liver.  Most individuals who are infected with the hepatitis C virus exhibit no symptoms of liver disease or liver cancer and maintain stable liver function.  The need to treat an inmate-patient's hepatitis C is based on a number of factors, including the patient's use of alcohol and drugs, their willingness to be compliance with treatment, their current health, and the progression of the disease.
>
> ****
>
> 25.  Mr. Houston's lab results were received on January 12, 2016 and demonstrated the following relevant values with respect to his hepatitis C:  GGT 32 (normal), AST 38 (normal), ALT (slightly elevated), platelet count 251, HCV RNA quantitative 13848631 (indicates presence of hepatitis C virus)…
>
> 26.  Mr. Houston's medical file was forwarded to me on January 21, 2016 for review and an individualized medical assessment to be made concerning the appropriate course of treatment for Mr. Houston's hepatitis C…
>
> 27.  At that time I personally reviewed Mr. Houston's medical history and available records, physical examinations in file, and laboratory assessments with respect to his hepatitis C.  In my medical opinion, Mr. Houston's hepatitis C did not medically indicate a need for prescription drug treatment because his physical exams showed him to be asymptomatic, his history indicates he is inclined to use intravenous drugs, and importantly, his lab results were not demonstrable of any liver failure and that he had no impairment in liver function.  Pursuant to Policy 1741, an individualized determination was made by me based on my professional medical opinion that the best course of treatment concerning Mr. Houston's hepatitis C would be regular monitoring and assessment at 6 month intervals.
>
> 28.  In accordance with Policy 1741, Mr. Houston had follow up lab assessment approximately 6 months later, on June 6, 2016.  I personally reviewed the lab values, which in my professional opinion did not indicate that Mr. Houston was experiencing abnormal liver function.  Therefore, pursuant to Policy 1741, I

determined that the proper course of treatment for Mr. Houston was that his hepatitis C continue to be monitored…

29. Mr. Houston was shortly thereafter discharged from the care of County of Sacramento CHS and transferred to the custody of the California Department of Corrections June 24, 2016. Thus concluding our care for Mr. Houston…

30. Mr. Houston was provided medically appropriate care and treatment with respect to his hepatitis C pursuant to Policy 1741. He was admitted to the County of Sacramento in June 2015, and per Policy 1741, underwent physical examinations and laboratory assessments after six months of incarceration to ensure he was drug and alcohol free given his history of IV drug use. Mr. Houston's hepatitis C assessment labs were performed in accordance to Policy 1741 provisions, being done after 6 months of incarceration. His medical history, available medical records, and laboratory assessments were then personally evaluated by me, the Medical Director of CHS, and an individualized determination was made with respect to the best course of care and treatment for Mr. Houston based on the progression of his disease. Mr. Houston was asymptomatic and his laboratory assessments indicated unimpaired liver function, therefore in my professional medical opinion and in accordance with Policy 1741 it was determined that the best course of treatment for Mr. Houston's hepatitis C was that it be monitored at regular six month intervals. Prior to Mr. Houston being transferred to the California Department of Corrections and Rehabilitation, he underwent his six month interval assessment on June 6, 2016 …, and the results continued to demonstrate he had normal liver function. In light of Mr. Houston being asymptomatic and having unimpaired liver function, it is not medically advisable to subject him to the harmful adverse side effects of prescription drug treatment for hepatitis C which include but are not limited to fever, chills, nausea, vomiting, fatigue, muscle pain and weakness, hair loss, diarrhea and depression. If my profession medical opinion, monitoring was the most appropriate medically acceptable course of treatment for Mr. Houston's hepatitis C.

(ECF No. 52-5 at 3-9.)

Defendant also argues that plaintiff's failure to receive prescription drug treatment for hepatitis C after his transfer to CDCR custody in June 2016 supports the finding that plaintiff did not qualify for hepatitis drug treatment while housed at the Sacramento County Jail. In support of this argument, defendant submitted the declaration of Dr. Austria, a doctor working at North Kern State Prison ("NKSP"). (ECF No. 52-6.)

Dr. Austria states that on June 30, 2016, plaintiff underwent lab studies so that Dr. Austria could evaluate and determine the level of care for his hepatitis C. (Id. at 5.) The lab studies included a hepatitis panel, complete blood count and comprehensive metabolic panels. (Id.)

Using the results of the June 30, 2016 lab results, Dr. Austria assessed the severity of plaintiff's hepatitis C to determine the appropriate level of care for him based on CDCR's Hepatitis Treatment Policy. (Id.)

To assess plaintiff's hepatitis C, Dr. Austria calculated plaintiff's Fibrosis-4 ("FIB-4") score. (Id. at 5-6.) FIB-4 is a clinically proven non-invasive measure based on several laboratory test indicators to estimate the amount of fibrosis (scarring in the liver) caused by hepatitis C. (Id. at 6.) Use of the FIB-4 calculations to assess the level of fibrosis in a patient's liver is a widely used and medically acceptable measure to gauge liver damage in the first instance, prior to a liver biopsy, given the potential for sampling errors and morbidity in conducting an invasive biopsy procedure. (Id.)

Plaintiff's June 30, 2016 lab results showed that he had an AST level of 31, Platelet Count of 257, ALT level of 56, and he was 37 years old. (Id.) Using plaintiff's values, his FIB-4 score was calculated as 0.60. (Id.) Using CDCR's Hepatitis Treatment Policy, plaintiff's FIB-4 score was demonstrative of low-stage fibrosis, and the appropriate recommendation for treatment for plaintiff's hepatitis C was to defer treatment, and to clinically reassess him annually. (Id. at 7.) For plaintiff to be considered for the next step in evaluating whether he is a candidate for prescription drug treatment for his hepatitis C, his FIB-4 score must be equal to or greater than 1.45. (Id. at 7.)

Dr. Austria also states that in his professional medical opinion, based on plaintiff's physical examination, lab studies and medical history including admitted IV drug use as recent as May 2015, plaintiff is not a candidate for prescription drug treatment for his hepatitis C. (Id.) Use of illicit drugs is an absolute contraindication to prescription drug hepatitis C treatment, and is one of the primary exclusion criteria. (Id.) More importantly, plaintiff's lab studies and physical examinations did not indicate the presence of any symptoms of hepatitis C or liver failure, and is often the case with many individuals with hepatitis C, a majority of them do not require any prescription drug treatment because it can be decades for the hepatitis C virus to pose tangible harm to the patient's liver. (Id. at 7-8.) The side effects of the prescription drug treatment protocols for hepatitis C are severe and can include, but not be limited to fever, chills,

nausea, vomiting, fatigue, muscle pain and weakness, hair loss, diarrhea and depression. (Id. at 8.) In plaintiff's case, it is medically appropriate that his condition be monitored annually in accordance with CDCR's hepatitis C treatment policy, and not that he be subjected to the severe adverse side effects of prescription drug treatment when he is not experiencing any symptoms of hepatitis C or liver failure. (Id.)

*Lab Results*

Citing Dr. Nugent's declaration, quoted above, defendant argues that plaintiff's lab work in January 2016 and June 2016 demonstrated that he did not qualify for prescription drug treatment for his hepatitis C. Defendant argues that Dr. Austria's finding that plaintiff did not qualify for prescription drug treatment based on his lab work following his transfer to CDCR custody in June 2016 supports this finding.

In his opposition, plaintiff argues that his January 2016 and June 2016 lab work demonstrated that he qualified for prescription drug treatment.

In particular, plaintiff argues that the results of his January 2016 lab work for Albumin, Bilirubin, Platelets, Hemoglobin, Nuetrophils and Creatine Levels demonstrated that he qualified for prescription drug treatment. (See ECF No. 65 at 53-54.) Plaintiff cites the older version of Policy 1741 which provided that prescription drug treatment was accepted for patients with abnormal ALT values, Albumin > 3.5 g/d, Bilrubin < 1.5 g/d (men), and Creatnine >I 5 mg.d. (ECF No. 65.) The undersigned observes that the newer version of Policy 1741 also lists these factors, i.e. Creatinine, Albumin, Bilirubin, Hemoglobin and Neutraphils, as relevant in determining whether inmate-patients qualify for prescription drug treatment. (ECF No. 52-5 at 15.)

Plaintiff also argues that the results of his June 2016 blood work, reviewed by Dr. Nugent, demonstrate that he qualified for prescription drug treatment.

While Dr. Nugent did not specifically mention all of the test results listed in the January 2016 report, the undersigned does not read Dr. Nugent's declaration as stating that only the results of the January 2016 tests he specifically mentioned, i.e., GGT, AST, ALT, platelet count and HCV RNA, demonstrated that plaintiff did not qualify for prescription drug treatment. In his

declaration, Dr. Nugent goes on to state that he reviewed the "laboratory assessments," which the undersigned reasonably infers to mean that Dr. Nugent reviewed the entire results of plaintiff's January 2016 lab work. In other words, it is not reasonable to infer that Dr. Nugent's failure to specifically discuss the result of every test meant that those tests not discussed in his declaration indicated that plaintiff qualified for prescription drug treatment.

The undersigned further finds that Dr. Nugent's statement that he reviewed the "lab values" for plaintiff's June 2016 blood work means that he reviewed all of the relevant lab work.

The undersigned also finds that plaintiff's interpretation of the results of his January 2016 and June 2016 lab results is not admissible. As a layperson, plaintiff is not qualified to offer an interpretation of his medical records. See Fed. Rule of Evidence 701. An expert witness is required to interpret these medical records. See Fed. Rule of Evid. 702.[6] For these reasons, the undersigned finds that plaintiff's layperson opinion regarding the results of his January and June 2016 blood work is not admissible evidence regarding the results of these tests.

In his opposition, plaintiff also disputes defendant's evidence that Dr. Austria found plaintiff ineligible for prescription drug treatment following his transfer to CDCR in June 2016. Plaintiff argues that Dr. Austria was not qualified to render an opinion regarding his need for prescription drug treatment because at the time of this evaluation, plaintiff was housed at a CDCR reception center. Plaintiff cites the CDCR Hepatitis Treatment Policy which states that hepatitis C "evaluation and treatment is generally not initiated in reception centers." (ECF No. 52-6 at 30.)

---

[6] In the reply, defendant argues that the lab results plaintiff cites in his opposition are normal:

> In fact, the lab values show that Plaintiff's ALT was only slightly elevated (55, reference range 9-46), Albumin was normal (44, reference range 36-51), Bilirubin was normal (4, reference range 2-1.2), Platelet Count normal (251, reference range 140-400), Hemoglobin normal (143, reference range 132-171), Neutrophils normal, and Creatnine normal (106, reference 60-135). Dr. Nugent assessed these lab results as well as the rest of plaintiff's medical records and determined that plaintiff's findings were not demonstrable of any liver failure and that he had no impairment of liver function.

(ECF No. 66-1 at 4.)

Although defendant provides no expert evidence to support this argument, it appears that defendant's characterization of the results discussed above is correct. (See ECF No. 65 at 53-54.)

18

As noted by defendant in the reply, the CDCR Hepatitis C Policy does not state that a physician in a reception center cannot provide evaluations and treatment for hepatitis C. In addition, as noted by defendant, Dr. Austria's expert declaration demonstrates that plaintiff was not a candidate for prescription drug treatment based, in part, on his lab studies. The undersigned agrees that Dr. Austria's declaration is evidence that plaintiff's hepatitis C lab results continued to demonstrate that he did not qualify for prescription drug treatment following his transfer to CDCR in June 2016.

Defendant's expert evidence demonstrates that plaintiff's lab work showed that he did not qualify for prescription drug treatment. For the reasons discussed above, the undersigned finds that plaintiff has not met his burden of opposing defendant's expert evidence regarding this issue.

*Intravenous Drug Use*

As discussed above, Dr. Nugent properly considered plaintiff's drug use in evaluating plaintiff's eligibility for prescription drug treatment. Plaintiff does not dispute that he used intravenous drugs, even as recently as April 2015. Accordingly, the undersigned finds that it is undisputed that Dr. Nugent properly found that plaintiff's history of intravenous drug use was a factor demonstrating that he did not qualify for prescription drug treatment.

*Physical Exams*

As discussed above, Dr. Nugent found that plaintiff did not qualify for prescription drug treatment because he was asymptomatic. As discussed herein, plaintiff somewhat disputes defendant's evidence regarding his alleged symptoms.

The undersigned first observes that Dr. Nugent does not directly describe the symptoms of hepatitis C. However, in his declaration, Dr. Austria describes them as including abdominal pain, fatigue, nausea and vomiting. (ECF No. 52-6 at 4.) Plaintiff does not dispute that these are symptoms of hepatitis C.

Plaintiff does not dispute that on September 28, 2015, he was seen by CHS medical staff and requested to be tested for hepatitis C. (ECF No. 52-2 at 4; ECF No. 52-5 at 39; ECF No. 52-65 at 18.) Plaintiff does not dispute that he denied any symptoms of hepatitis C. (ECF No. 52-2 at 4; ECF No. 52-5; ECF No. 65 at 18.) Plaintiff does not dispute that the medical records from

this appointment reflect that his vital signs were stable, his respiration even, his lungs were clear, his temperature was normal (98.2) and his blood pressure was 110/73.  (ECF No. 52-2 at 4; ECF No. 52-5 at 39; ECF No. 18 at 104.)

It is undisputed that plaintiff was seen by medical staff on October 20, 2015, for complaints of a skin rash and on October 24, 2015, concerning clogged ears.  (ECF No. 52-2 at 5; ECF No. 52-5 at 37; ECF No. 65 at 19.)

It is undisputed that on October 25, 2015, plaintiff was seen by medical staff due to complaints of weakness, headache, fever, upset stomach, sore joints, no interest in food, yellow skin, dark urine, and pain in his right side.  (ECF No. 52-2 at 5; ECF No. 52-5 at 37; ECF No. 65 at 19-20.)  The medical records from that date indicate that plaintiff was seen on "priority flex sick call." (ECF No. 52-5 at 37.)  The records state that plaintiff told the nurse, "I have hep c, I heard there is a new treatment that is curing it, I am requesting for the treatment at this time…The symptoms are what you get if you have hep C."  (ECF No. 52-5 at 37.)  Plaintiff does not deny making these statements.  (ECF No. 65 at 20.)

The medical records from that date state that plaintiff sought medical treatment that day so that the prescription drug treatment would be approved.  (ECF No. 52-5 at 37.)  The nurse who saw plaintiff wrote that he had no acute symptoms and she advised him to sign up for sick call and that he was scheduled to see the doctor for the same reason. (Id.)  Plaintiff claims that the nurse did not examine him for the symptoms he alleges to have suffered from.  (ECF No. 65 at 20.)

In his opposition, plaintiff claims that on February 17, 2016, and March 20, 2016, he requested medical care for symptoms associated with hepatitis C but was denied adequate medical care.  (ECF No. 65 at 29-30.)  The medical records from February 17, 2016, attached to plaintiff's opposition, state that plaintiff had a stuffy nose with chills and sore joints.  (Id. at 82.)  Plaintiff's temperature was 96.6.  (Id.)  The nurse who saw plaintiff that day diagnosed plaintiff with "possible common cold," prescribed Claritin and Tylenol, and directed him to drink more fluids.  (Id.)

////

The medical records from March 20, 2016, attached to plaintiff's opposition, state that plaintiff complained of dizziness, nausea/vomiting, stomach pain and shaking in both hands. (Id.) Plaintiff's temperature on that date was 101. (Id.) The records state that plaintiff was "sent to mhu for observation, but mhu nurse said that back wall was full. And he was sent to RBF single cell for observation. PT encouraged to drink water." (Id.)

The records above do not demonstrate that plaintiff suffered from symptoms caused by hepatitis C. The records demonstrate that plaintiff's complaints of symptoms related to hepatitis C could either not be verified or else were caused by other illnesses. Plaintiff has not presented sufficient evidence to refute Dr. Nugent's opinion that, with respect to hepatitis C, he was asymptomatic.

The undersigned also observes that plaintiff has not demonstrated that he suffered from symptoms related to hepatitis C following his transfer to CDCR in June 2016. Plaintiff does not dispute that on June 28, 2016, at 9:15 a.m., he was evaluated by Nurse Practitioner Meda. (ECF No. 52-5 at 8; ECF No. 65 at 32-33.) Plaintiff does not dispute that during this examination, he had no abdominal pain, fatigue, nausea or vomiting. (ECF No. 52-2 at 8; ECF No. 64 at 32-33.) Plaintiff does not dispute that he had no symptoms of hepatitis C or liver failure during this examination. (ECF No. 52-2 at 8-9; ECF No. 64 at 32-33.)

It is undisputed that on June 28, 2016, at approximately 9:30 p.m., plaintiff told medical staff that he had diarrhea, nausea and vomiting, with no chest pain or shortness of breath. (ECF No. 52-2 at 9; ECF No. 65 at 34, 87.) The medical record states that plaintiff complained of abdominal pain. (ECF No. 65 at 87.) The medical records also state that plaintiff's abdomen was "soft, tender to palpation." (Id.) Plaintiff has a temperature of 102.7. (Id.) The records state that plaintiff was given IV fluids, acetaphinomen and Pepto Bismol. (Id.) At approximately 11:20 p.m., plaintiff asked to leave. (Id.) Plaintiff reported that he felt hunger pains. (Id.) Plaintiff was told he had to stay a bit longer. (Id.) Plaintiff was released at around midnight and encouraged to drink fluids. (Id.) Plaintiff was advised to notify staff if his condition worsened. (Id.)

Plaintiff has provided no evidence that the symptoms that he suffered on June 28, 2016, did not improve. The undersigned does not find that plaintiff has shown that the symptoms he

suffered on the night of June 28, 2016, were related to hepatitis C. Plaintiff has also provided no

evidence that he suffered from symptoms that could be related to hepatitis C after June 28, 2016.

For the reasons discussed above, the undersigned finds that plaintiff has not presented

sufficient evidence to create a dispute regarding whether his hepatitis C was symptomatic.

Accordingly, based on the undisputed evidence presented by defendant, the undersigned finds

that plaintiff's hepatitis C was asymptomatic while he was housed at the Sacramento County Jail.

*Conclusion*

Defendant has presented undisputed evidence that plaintiff did not qualify for prescription

drug treatment for his hepatitis C while housed at the Sacramento County Jail because of his

history of intravenous drug use, he was asymptomatic and, most importantly, because his lab

results were not demonstrable of liver failure or impairment of any liver function. Because

plaintiff did not face a substantial risk of serious harm if he did not receive prescription drug

treatment for hepatitis C while housed at the Sacramento County Jail, he has not demonstrated

that his failure to receive this treatment constituted deliberate indifference. See Toguchi v.

Chung, 391 F.3d 1051, 1057 (9th Cir. 2004). In support of this finding, the undersigned observes

that plaintiff has presented no evidence that he received prescription drug treatment for hepatitis

C following his release from the Sacramento County Jail in June 2016.

Finally, in his opposition, plaintiff alleges that on October 29, 2015, Dr. Padilla, employed

at the Sacramento County Jail, told plaintiff that the county's policy was not to treat him because

it costs too much and that it was cheaper to let him die. (ECF No. 65 at 21.) Plaintiff argues that

the alleged statements by Dr. Padilla show that defendant Sacramento County had a policy to

treat hepatitis C but failed to follow it.

Even if Dr. Padilla made these statements to plaintiff, the evidence demonstrates that

plaintiff did not receive prescription drug treatment because it was not medically warranted.

Because plaintiff's failure to receive prescription drug treatment did not violate his constitutional

right to adequate medical care, Dr. Padilla's alleged statements are not material.

For the reasons discussed above, the undersigned finds that plaintiff's failure to receive

prescription drug treatment while housed at the Sacramento County Jail from June 2015 to June

2016 did not violate plaintiff's Fourteenth Amendment right to adequate medical care. Defendant Sacramento County should be granted summary judgment on this ground.

5. Analysis: Constitutionality of Policy 1741

Defendant moves for summary judgment on grounds that Policy 1741 did not cause plaintiff to receive inadequate medical care. As discussed above, plaintiff does not challenge the constitutionality of Policy 1741. Instead, plaintiff argues that defendant has a policy or practice of failing to follow Policy1741. To succeed on this claim, plaintiff must demonstrate that his failure to receive prescription drug treatment violated his constitutional rights. Because, for the reasons discussed above, plaintiff's failure to receive prescription drug treatment was not unconstitutional, the undersigned need not further discuss whether defendant had a policy or practice of failing to follow Policy 1741.

C. Failure to Exhaust Administrative Remedies

1. Legal Standard

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

Prisoners are required to exhaust the available administrative remedies prior to filing suit. Jones v. Bock, 549 U.S. 199, 211 (2007); McKinney v. Carey, 311 F.3d 1198, 1199-1201 (9th Cir. 2002).

Proper exhaustion of available remedies is mandatory, Booth v. Churner, 532 U.S. 731, 741 (2001), and "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]" Woodford v. Ngo, 548 U.S. 81, 90 (2006). The Supreme Court has also cautioned against reading futility or other exceptions into the statutory exhaustion requirement. See Booth, 532 U.S. at 741 n.6. Moreover, because proper exhaustion is necessary,

23

a prisoner cannot satisfy the PLRA exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal. See Woodford, 548 U.S. at 90-93. "[T]o properly exhaust administrative remedies prisoners 'must complete the administrative review process in accordance with the applicable procedural rules,' [] - rules that are defined not by the PLRA, but by the prison grievance process itself." Jones v. Bock, 549 U.S. 199, 218 (2007) (quoting Woodford, 548 U.S. at 88).

Failure to exhaust is "an affirmative defense the defendant must plead and prove." Bock, 549 U.S. at 204, 216. In Albino, the Ninth Circuit agreed with the underlying panel's decision[7] "that the burdens outlined in Hilao v. Estate of Marcos, 103 F.3d 767, 778 n.5 (9th Cir. 1996), should provide the template for the burdens here." Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). A defendant need only show "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino, 747 F.3d at 1172. Once the defense meets its burden, the burden shifts to the plaintiff to show that the administrative remedies were unavailable. See Albino, 697 F.3d at 1030-31.

   2. Analysis

Defendant argues that plaintiff failed to exhaust administrative remedies because he did not file a grievance until after he filed this action, i.e., he failed to exhaust administrative remedies prior to filing this action. The background to this argument follows herein.

Plaintiff's original complaint is court file stamped September 30, 2015. (ECF No. 1). This complaint does not contain a proof of service in order for the court to determine when it was filed pursuant to the mailbox rule, although it was signed by plaintiff on September 26, 2015. (Id. at 4.) In the original complaint, plaintiff alleged that he suffered from hepatitis C and schizophrenia. (Id. at 3.) In relevant part, plaintiff alleged that he was informed that he would not receive treatment for hepatitis C because the policy was not to treat this disease. (Id. at 3.)

////

---

[7] See Albino v. Baca, 697 F.3d 1023, 1031 (9th Cir. 2012). The three judge panel noted that "[a] defendant's burden of establishing an inmate's failure to exhaust is very low." Id. at 1031. Relevant evidence includes statutes, regulations, and other official directives that explain the scope of the administrative review process. Id. at 1032.

On October 16, 2015, the undersigned dismissed the original complaint with leave to amend because plaintiff had not named a proper defendant. (ECF No. 5.) Plaintiff's amended complaint is court file stamped October 26, 2015. (ECF No. 7.) Like the original complaint, the amended complaint does not contain a proof of service for the court to determine when it was filed pursuant to the mailbox rule. The amended complaint named Sacramento County as a defendant. (Id.) Plaintiff alleged that he did not receive treatment for hepatitis C while housed at the Sacramento County Jail. (Id.) On October 30, 2015, the undersigned ordered service of the amended complaint on defendant Sacramento County. (ECF No. 8.)

Defendant argues, and plaintiff does not dispute, that he submitted his first administrative grievance regarding hepatitis C on September 30, 2015. (ECF No. 52-2 at 8; ECF No. 65 at 31; ECF No. 52-7 at 4.) According to defendant, this grievance was received by healthcare staff for review on October 1, 2015. (ECF No. 52-7 at 4.) On October 5, 2015, the healthcare coordinator issued a written response to the grievance. (Id.) Defendant argues that plaintiff did not submit a written appeal of the October 5, 2015 response to the facility commander, as the October 5, 2015 response advised. (Id.) Instead, defendant argues, plaintiff submitted another grievance regarding hepatitis C on October 24, 2015. (Id.)

In his opposition, plaintiff argues that he exhausted his administrative remedies before filing his amended complaint on October 26, 2015. (ECF No. 65 at 3.) Plaintiff alleges that after receiving the October 5, 2015 response from the healthcare coordinator, he submitted an appeal to the watch commander. (Id.) Plaintiff argues that he received no response to this appeal. (Id.)

As discussed above, prisoners are required to exhaust the available administrative remedies prior to filing suit. Jones v. Bock, 549 U.S. 199, 211 (2007); McKinney v. Carey, 311 F.3d 1198, 1199-1201 (9th Cir. 2002). Plaintiff filed his first administrative grievance regarding hepatitis C on the day his original complaint was filed in the court. For that reason, plaintiff failed to exhaust his administrative remedies prior to filing this action.[8]

---

[8] Because plaintiff filed this action before even receiving the response to his first level grievance from the health care coordinator, the undersigned need not consider whether the watch commander's alleged failure to respond to plaintiff's administrative appeal exhausted plaintiff's administrative remedies. See Ross v. Blake, 136 S. Ct. 1850, 1856 (2016) (administrative

While plaintiff argues that he exhausted administrative remedies after he filed an amended complaint, a complaint may be amended to add *new* claims so long as the administrative remedies for the new claims are exhausted prior to amendment. <u>Cano v. Taylor</u>, 739 F.3d 1214, 1220–21 (9th Cir. 2014) (new claims added to a lawsuit via amendment that are exhausted prior to the amendment comply with the exhaustion requirement); <u>Rhodes v. Robinson</u>, 621 F.3d 1002, 1007 (9th Cir. 2010) (new claims asserted in an amended complaint are to be considered by the court so long as administrative remedies with respect to those new claims are exhausted before the amended complaint is tendered to the court for filing). Plaintiff's amended complaint did not raise new claims. In both the original and amended complaints, plaintiff alleged that he was denied treatment for hepatitis C. Therefore, plaintiff's administrative remedies had to be exhausted before he filed the original complaint.

For the reasons discussed above, defendant's motion for summary judgment on the grounds that plaintiff failed to exhaust administrative remedies should be granted.

Accordingly, IT IS HEREBY ORDERED that plaintiff's motion to reopen discovery (ECF No. 58) is denied;

IT IS HEREBY RECOMMENDED that:

1. Plaintiff's motion to amend (ECF No. 59) be granted with respect to the claims against defendant Sacramento County that are consistent with those addressed in the pending summary judgment motion; plaintiff's motion to amend should be denied in all other respects;

2. Defendant's motion for summary judgment (ECF No. 52) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The

exhaustion may not be required when "prison administrators thwart inmates from taking advantage of a grievance process…").

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 11, 2017

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Hou2055.sj